MARJORIE McDANIEL, BY HER GUARDIAN, EVERETT Mc-
DANIEL, APPELLANT, v. McNEIL LABORATORIES, INC., A
PENNSYLVANIA CORPORATION, APPELLEE,
CONSOLIDATED WITH EVERETT D. McDANIEL, APPELLANT,
v. McNEIL LABORATORIES, INC., A PENNSYLVANIA
CORPORATION, APPELLEE.

241 N. W. 2d 822

Filed May 19, 1976.  No. 40270.

Warren C. Schrempp, Richard I. Dinsmore, and Richard E. Shugrue of Schrempp, Dinsmore & McQuade, and Joseph N. Lindquist, for appellant.

Charles F. Gotch and Terry J. Grennan of Cassem, Tierney, Adams & Gotch, for appellee.

Heard before WHITE, C. J., BOSLAUGH, McCOWN, and CLINTON, JJ., and KUNS, Retired District Judge.

McCOWN, J .

This case involves consolidated causes of action by the plaintiff, Everett D. McDaniel, on his own behalf and as guardian of his wife, Marjorie McDaniel. The actions seek recovery for injuries and damages resulting from a surgical operation performed on Marjorie McDaniel on February 2, 1971, at an Omaha hospital.

Five defendants were named in the actions: . McNeil Laboratories, Inc.; the hospital; the operating surgeon; the anesthesiologist; and the head of the anesthesiology department of the hospital. The hospital and the operating surgeon were dismissed prior to trial. The active anesthesiologist and the head of the anesthesiology department, by settlement and agreement, were dismissed on the third day of trial, and the case continued against the sole remaining defendant, McNeil Laboratories, Inc. The issue of whether that defendant was or was not negligent was submitted to the jury. The jury returned its verdict for the defendant and the plaintiffs have appealed.

Although only the liability of the defendant, McNeil Laboratories, Inc., is involved in this appeal, it is necessary to detail many of the facts involved to furnish the appropriate background for consideration of the issues involving the defendant, McNeil. The actions, duties, and responsibilities of the various defendants are intermingled and interrelated.

The plaintiff, Marjorie McDaniel, was admitted to the hospital on January 31, 1971, for what was expected to be a routine hemorrhoidectomy. Mrs. McDaniel was 47 years old and the mother of three children. She was examined and rated as one of the class considered to be the best risks for surgery. At about 8 a.m. on the morning of February 2, 1971, she was given 100 mg. of nembutal, a barbiturate. At 8:30 a.m., she was given 75 mg. of demerol, and .3 mg. of scopolamine as preoperative medication. She was taken into surgery around 9 a.m. Shortly after Mrs. McDaniel arrived in the operating room, the attending anesthesiologist decided that Mrs. McDaniel was not satisfactorily sedated and gave her ½ cc of the drug Innovar, and a few minutes later another ½ cc of Innovar. The next drug administered was the main anesthetic, Xylocaine, which was administered as a caudal block. A 5-cc test amount was injected in the spine and then a 17-cc dose was injected at 9:40. The surgery began shortly after 9:45 a.m., and until about 10 a.m., the operation was apparently proceeding normally. Shortly before 10 a.m., Mrs. McDaniel unemotionally told the anesthesiologist that she could still feel "what they are doing." The anesthesiologist then gave her 2 cc's of Innovar through the I.V. Almost immediately, shortly after 10 a.m., there was a dramatic drop in her blood pressure and pulse. The anesthesiologist thereafter inserted a plastic airway in her mouth and began administering oxygen through a mask. The circulating nurse noticed her color was very blue some minutes before the operation was over. She found no pulse in the patient's wrist. She asked the anesthesiologist about it and was told that the patient was all right and that he had a temporal pulse. The operating surgeon reported on two occasions that the blood was very black and inquired about the patient's condition but the anesthesiologist responded that it was all right to go ahead and finish. Just before the operation was finished, the anesthesiologist reported that he

could not get a pulse. Mrs. McDaniel was then turned over onto her back and was found to be in cardiac arrest. At that point emergency procedures of several kinds were instituted. Mrs. McDaniel's life was saved but because of the severe brain damage, she has never regained consciousness. She is comatose. Her organs continue to function, but she is unconscious and completely unable to respond to stimuli or move any part of her body. She has a tracheotomy which facilitates breathing. She is fed by a tube into her stomach and there is a catheter to the bladder. The damage is permanent and there is no expectation of recovery.

The drug involved here is manufactured by the defendant, McNeil Laboratories, Inc. It is called Innovar. It is used as an anesthetic. Its pharmacologic action produces analgesia and sedation. It contains two drugs, both of which are also marketed separately by McNeil. These drugs are fentanyl, a synthetic narcotic analgesic, and droperidol, a major sedative tranquilizer. These two drugs are combined in a fixed ratio of 50 parts of droperidol to 1 part of fentanyl to produce Innovar.

Fentanyl is a synthetic narcotic which is 100 to 150 times more powerful than morphine. It takes effect almost immediately when used intravenously, reaches maximal analgesic effect in a very few minutes, and is then effective for a period of 30 to 60 minutes. Fentanyl may cause respiratory depression and, in turn, carbon dioxide is not adequately disposed of and adequate oxygen is not taken in. Fentanyl can also cause muscle rigidity, particularly of the chest walls, which then interferes with breathing. Respiratory depression occurs with all narcotics, as does muscle rigidity if enough is given.

Droperidol is a major tranquilizer which takes effect within 5 to 10 minutes when given intravenously and continues to be effective anywhere from 4 to 12 hours, and on occasion, even longer. Droperidol may cause hypotension, a decrease in blood pressure. The lowered

blood pressure may lead to hypoxia, which means that insufficient oxygen is delivered to the tissues and damage may result. Brain tissues are the most sensitive to lack of oxygen. Most tranquilizers, if enough is given, can cause low blood pressure and impaired circulation.

McNeil Laboratories, Inc., began its studies and clinical investigations of the drug Innovar in the United States in 1963, sometime after Innovar had been introduced for clinical use in Germany and the Netherlands. An investigative new drug application was filed by McNeil with the United States Food and Drug Administration in 1963. A new drug application was filed in May of 1964, and amended in May of 1966. During these years, clinical investigation was conducted by several hundred investigators. The information collected and filed with the FDA covered approximately 5,800 patients. Innovar was approved by the FDA on January 31, 1968. There have been no changes in composition since that time. Fentanyl was approved for marketing on February 19, 1968, and the distribution of Innovar and fentanyl was started in March 1968. Droperidol was approved by the FDA for marketing on June 11, 1970, and marketed shortly thereafter.

Printed package inserts containing pharmacological information, safety evaluations, recommended dosages and administration, and warnings as to adverse reactions and control measures to be taken in such event, are included in the approval by the Food and Drug Administration. This approved printed material is distributed with the drug as a package insert. The package insert at the time of the operation in this case was printed March 19, 1968, and used thereafter until it was revised September 14, 1973. Primarily the revised material emphasized the severity of adverse reactions and was more specific with recommendations as to precautions and control measures available.

No new adverse reactions have been discovered since the approval of Innovar by the FDA, and there is evi-

dence that there was nothing known at the time of trial about the nature of adverse reactions which was not known at the time the application was submitted to and approved by the Food and Drug Administration. There is also specific evidence that all material which McNeil received in connection with reported adverse reactions, both before and after February 2, 1971, has been forwarded to the FDA. Both 1968 and 1973 package inserts contain warnings that respiratory depression, muscular rigidity, and hypotension were common adverse reactions.

There is no question about the purity or effectiveness of the Innovar used here. It did not contain anything it should not have contained, nor was there anything omitted which should have been included. It was the drug it purported to be and was manufactured, packaged, and distributed in the form approved by the Food and Drug Administration.

The doctor who administered the Innovar to Mrs. McDaniel was a specialist in anesthesiology who received his medical degree in 1966. During his senior year in medical school, the head of the department of anesthesiology was one of the individuals who was carrying out clinical research on Innovar before it was marketed. During this period of testing of Innovar, the anesthesiologist in this case was in operating rooms where it was being used and attended seminars where it was discussed. He had special studies as to the adverse reactions of Innovar and appropriate control measures. During his residency in anesthesiology after Innovar was approved for use by the Food and Drug Administration, the anesthesiologist used Innovar and saw it used frequently. He was fully aware of the fact that Innovar contained two components with different lengths of effectiveness and that he could use or transfer to either one of the components alone under many circumstances. The anesthesiologist testified that there was nothing in the 1973 package insert which he did not know at the time of

Mrs. McDaniel's surgery in 1971. He also testified that he had read the complete Innovar basic manual.

The 2 cc's of Innovar which the anesthesiologist administered to Mrs. McDaniel at 10 o'clock was double the maximum dosage recommended for maintenance. There was substantial other evidence which would have supported a finding that his departures from reasonable standards of care were the proximate cause of the brain damage which Mrs. McDaniel suffered.

After settlement and dismissal of the anesthesiologist, the case against McNeil Laboratories, Inc., was submitted to the jury only on the theory of negligence. The plaintiffs had pleaded four separate theories of liability and their basic assignments of error rest on the failure of the court to submit the case to the jury on the theory of strict liability, express warranty, and implied warranty, in addition to the theory of negligence on which it was actually submitted.

Plaintiffs contend that the defendant, McNeil Laboratories, Inc., is strictly liable for physical harm caused to any ultimate user or consumer of the drug Innovar under the rule of strict liability set out in Restatement, Torts 2d, section 402 A, page 347. That section provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product

from or entered into any contractual relation with the seller."

This court has previously adopted the doctrine of strict liability for products. See Kohler v. Ford Motor Co., 187 Neb. 428, 191 N. W. 2d 601.

Portions of several of the comments to section 402 A are appropriate and pertinent here. Comment h, page 351, states in part: "A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, * * * or from abnormal preparation for use, * * * or from abnormal consumption, * * * the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate warning of the danger (see Comment j), and a product sold without such warning is in a defective condition.

"The defective condition may arise not only from harmful ingredients, not characteristic of the product itself either as to presence or quantity, but also from foreign objects contained in the product, from decay or deterioration before sale, or from the way in which the product is prepared or packed."

Comment i, page 352, provides in part: "The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. * * * The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

Comment j, page 353, provides in part: "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. * * *

"Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product

bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."

Comment k, page 353, to section 402 A, is peculiarly appropriate and directly applicable here. It is therefore quoted in full. "Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

The comments to section 402 A make it clear that the

liability stated in the section does not rest upon negligence. It is strict liability and the rule stated in the section does not require any reliance on the part of the consumer upon the reputation, skill, or judgment of the seller.

Plaintiff's assertion that Innovar is defective and unreasonably dangerous rests on the testimony of certain expert witnesses who testified that in their opinion the combination of fentanyl and droperidol in the fixed ratio of 1 to 50 made Innovar defective and unreasonably dangerous. Those expert witnesses generally agreed that there was nothing wrong with using droperidol and fentanyl separately or even together where the ratio of the combination was controlled by the anesthesiologist. The combination of the two in a fixed ratio in Innovar is the foundation upon which the plaintiffs rest their opinion that Innovar is defective and unreasonably dangerous. In essence, it might be said that plaintiffs contend that a fixed ratio combination of two drugs is improper drug design and is therefore unreasonably dangerous.

There is also an expression of opinion by plaintiffs' expert witnesses that the warnings in the original package insert were incomplete or inadequate. These opinions directly conflict with the opinions expressed by the various expert witnesses called by the defendant, and they also raise the issue of the effect of the approval of Innovar, and its package inserts, by the Food and Drug Administration. There is no evidence in this case that Innovar had been or was improperly manufactured, nor that the harmful results here were caused by any impurity or any error in compounding, packaging, or storage. The drug was exactly what it purported to be.

Innovar was approved by the Food and Drug Administration on January 31, 1968. That approval covers the official package inserts which include warnings as to adverse reactions and recommended counter measures. The "labeling" of the package inserts in the case of prescription drugs is revised from time to time as new

information becomes available. In the case of Innovar, the first revision after the initial approval in 1968 was in 1973. There is specific evidence which stands uncontradicted that the adverse reactions of respiratory depression, muscle rigidity, and hypotension were all known ever since Innovar has been studied. All the material and information in connection with reported adverse reactions, both prior to and after February 2, 1971, was forwarded to the Food and Drug Administration. The evidence wholly fails to establish that any knowledge or relevant information which the defendant had as to Innovar was not fully disclosed to the Food and Drug Administration.

Some courts have found that under such circumstances a prescription drug is, as a matter of law, a reasonably safe product. In Lewis v. Baker, Richardson-Merrell, Inc., 243 Ore. 317, 413 P. 2d 400, the Oregon Supreme Court held that under similar facts a drug properly tested, labeled with appropriate warnings, approved by the Food and Drug Administration, and marketed properly under federal regulation is, as a matter of law, a reasonably safe product. See, also, Leibowitz v. Ortho Pharmaceutical Corp., 224 Pa. Super. 418, 307 A. 2d 449. While such cases have subsequently been modified with respect to warnings, the underlying principle remains valid. See McEwen v. Ortho Pharmaceutical Corp., 270 Ore. 375, 528 P. 2d 522.

While approval by the Food and Drug Administration is not necessarily conclusive, its determinations, based upon the opinions and judgment of its own experts, should not be subject to challenge in a product liability case simply because some other experts may differ in their opinions as to whether a particular drug is reasonably safe, unless there is some proof of fraud or non-disclosure of relevant information by the manufacturer at the time of obtaining or retaining such federal approval.

In this case there is no essential conflict as to the

facts and the evidence. There is a difference of opinion among expert witnesses as to whether those facts establish that Innovar is or is not a defective and unreasonably dangerous drug. That issue was presented to the Food and Drug Administration in 1968. Its determination is persuasive and controlling in the absence of evidence that the determination was based upon inaccurate, incomplete, misleading, or fraudulent information. An unavoidably unsafe drug which has been approved for marketing by the United States Food and Drug Administration, properly prepared, compounded, packaged, and distributed, and accompanied by proper approved directions and warnings, as a matter of law, is not defective nor unreasonably dangerous, in the absence of proof of inaccurate, incomplete, misleading, or fraudulent information furnished by the manufacturer in connection with such federal approval or later revisions thereof. Under the facts disclosed by the evidence here, the District Court was correct in refusing to submit the theory of strict liability to the jury.

Plaintiffs assert that the District Court erred in refusing to submit the causes of action to the jury under the theory of either express or implied warranties. The evidence here stands uncontradicted that the anesthesiologist did not rely upon any warranties made by the defendant, either express or implied. He was fully aware of each and all the adverse reactions covered by the warnings, as well as being aware of counter measures. He specifically testified that there was no information or warning in the 1968 or 1973 package insert that he did not know at the time of Mrs. McDaniel's surgery in 1971. No warranty, express or implied, became part of the basis of the bargain. Under such circumstances, there was no error in refusing to submit the issues of express or implied warranty to the jury. See, Douglas v. Bussabarger, 73 Wash. 2d 476, 438 P. 2d 829; Ball v. Mallinkrodt Chemical Works, 53 Tenn. App. 218, 381 S. W. 2d 563, 19 A. L. R. 3d 813. That conclusion is also

reinforced by the record as to warnings. "Where there is proper warning, a manufacturer of a prescription drug cannot be held liable either on a breach of warranty or strict liability in tort theory." Leibowitz v. Ortho Pharmaceutical Corp., *supra.*

The plaintiffs contend that the District Court erred in refusing to give an instruction that: "You are instructed that the defendant, * * * in manufacturing and marketing its drugs is required not only to be skillful but also exceedingly cautious and prudent in view of the consequences that may attend the least inattention on its part. The highest degree of care known among practical men must be used by it to prevent injury from the use of their compounds and it is held to a special degree of responsibility corresponding with its superior knowledge and is generally held liable for the slightest negligence."

Plaintiffs charged the defendant here with negligence in failing to give adequate warning to the medical profession of the potential dangers inherent in the use of Innovar. No other grounds or specifications of negligence were submitted to the jury. The court instructed the jury that the defendant had the duty to give adequate warnings to the medical profession of the potential dangers inherent in its product which were known to the defendant or which, in the exercise of reasonable and ordinary care, could have been discovered by the defendant before February 2, 1971; and that "adequate warnings" meant that the warnings must convey fair and adequate notice of the possible dangers of using or even misusing the drug Innovar. The court also instructed that "ordinary care" is that amount or degree of care which ordinary prudence and a proper regard for one's safety and the safety of others would require under the circumstances shown in the evidence, and that "negligence" is the doing of some act under the circumstances surrounding the incident involved which a man of ordinary prudence would not have done, or the

failure to do some act or to take some precaution which a man of ordinary prudence would have taken.

It would have been appropriate for the court to give a more specific instruction as to the degree of care required of a manufacturer of drugs, but the specific wording of the instruction requested did not properly reflect the legal principles involved and was overdrawn. The instructions given, as a whole, required the standard of reasonable and ordinary care, and that the degree of care required depended upon a proper regard for the safety of all persons under the circumstances shown by the evidence. There is nothing specifically wrong with the instructions as given, but the plaintiffs complain that under those instructions "the defendant was held only to a standard of ordinary care." Restatement, Torts 2d, section 298, page 68, deals with want of reasonable care. Comment b, headed "Care Required," states in part: "The care required is always reasonable care. This standard never varies, but the care which it is reasonable to require of the actor varies with the danger involved in his act, and is proportionate to it. The greater the danger, the greater the care which must be exercised. * * * The amount of attention and caution required varies with the magnitude of the harm likely to be done if care is not exercised, and with the utility of the act. * * * if the act involves a risk of death or serious bodily harm, and particularly if it is capable of causing such results to a number of persons, the highest attention and caution are required even if the act has a very considerable utility."

It would have been proper to instruct the jury that the degree of care required varies with the circumstances, and that a very high degree of care is necessary on the part of a manufacturer of drugs. It would also be proper to instruct a jury that the manufacturer and distributor of a drug such as Innovar may be held to the degree of care and skill of an expert in that particular business. The instructions requested did not fully

and accurately reflect the legal principles involved, and the instructions as a whole reasonably covered the issues of negligence. It is not error to refuse a requested instruction if the legal principles announced therein are either incorrectly stated or inapplicable to the issues involved. Krantz v. Marge's Mufflers, Inc., 184 Neb. 838, 172 N. W. 2d 624.

Plaintiffs' remaining assignments of error are without merit. The judgment of the District Court is affirmed.

AFFIRMED.