ORTHO PHARMACEUTICAL CORPO-
RATION, Defendant-Appellant,

v.

Jo Ellen Murphy Hyland HEATH,
Plaintiff-Appellee.

No. 83SA293.

Supreme Court of Colorado,
En Banc.

July 7, 1986.

Bragg & Dubofsky, P.C., John T. Baker, Frank N. Dubofsky, Douglas E. Bragg, Denver, for plaintiff-appellee.

Tilly & Graves, P.C., Charles Q. Socha, Ronni M. Brammeier, Denver, Patterson, Belknap, Webb & Tyler, David F. Dobbins, New York City, for defendant-appellant.

Colorado Trial Lawyers Ass'n, James L. Gilbert and Associates, James L. Gilbert, Arvada, amicus curiae.

Colorado Defense Lawyers Ass'n, Wood, Ris & Hames, P.C., F. Michael Ludwig, Christian M. Lind, Denver, amicus curiae.

VOLLACK, Justice.

The defendant-appellant, Ortho Pharmaceutical Corporation (Ortho), a manufacturer of oral contraceptives, appeals a judgment entered upon a verdict of $975,000 and prejudgment interest in the amount of $506,542.80 in a products liability action for personal injuries suffered by plaintiff-appellee, Jo Ellen Murphy Hyland Heath (Heath). Heath attributed her acute kidney failure in November, 1974 to her use of Ortho-Novum, a brand of oral contraceptive made by Ortho. The trial court denied Ortho's motion for judgment N.O.V. and Ortho's motion for new trial. Ortho appeals. We reverse and remand for a new trial.

## I.

Heath first began taking Ortho-Novum in 1967. She stopped using oral contraceptives during the summer of 1970 because she wanted to become pregnant. She had a normal pregnancy and gave birth to a daughter in May, 1971. In February, 1972, her obstetrician-gynecologist, Dr. Clayton Evans, prescribed Ortho-Novum 1/50. In March, 1972, he increased her dosage to Ortho-Novum 1/80 after she reported one incident of break-through bleeding. She continued to take Ortho-Novum 1/80 until November, 1974. At that time, Heath, then aged 28, became critically ill with acute kidney failure, which eventually necessitated a kidney transplant. Subsequently, she developed cervical dysplasia which her doctors postulated was caused

by the immuno-suppressant therapy she was receiving to minimize the risk of kidney rejection. Because of a perceived risk of cervical cancer, she elected to have a hysterectomy in 1979. The risk of cancer also stemmed from the corticosteroid or immuno-suppressant medication prescribed to prevent rejection of the transplanted kidney.

Heath filed suit against Ortho alleging injuries caused by Ortho-Novum 1/80. Both sides presented expert testimony. Her experts attributed her acute kidney failure to malignant hypertension or hemolytic uremic syndrome (HUS) induced by her use of Ortho-Novum 1/80. Ortho's experts disputed the conclusions of Heath's experts. The case was submitted to the jury on theories of strict liability and negligence.

Heath also presented evidence that the warning provided by Ortho regarding the use of Ortho-Novum 1/80 was inadequate in that physicians were not told to monitor blood pressure and were not alerted to the possibility of kidney failure. Moreover, Heath alleged that, despite Ortho's compliance with the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301–392, (1972), which regulates the labeling of drugs, the warning provided to users of Ortho-Novum 1/80 was inadequate. Heath claimed that there was a common law duty to warn users of Ortho-Novum 1/80 in addition to the warnings mandated by the Food and Drug Administration (FDA).

## II.

■ Ortho first claims that Heath failed as a matter of law to prove that her kidney failure was caused by the use of Ortho-Novum 1/80. Ortho argues that the testimony of Heath's experts was purely conjectural and was based upon their subjective assessments. Specifically, Ortho argues that, because Heath's expert witnesses based their opinions upon diagnoses that ruled out other possible causes of her kidney failure, it was error for the court to allow the jury to decide whether it was "more likely than not" that Ortho-Novum 1/80 was the cause of her HUS and kidney failure.

In a jury trial the determination of facts, credibility of witnesses, and weight and probative value of the evidence are committed to the wisdom and discretion of the jury. *Kiefer, Inc. v. Hoffman,* 193 Colo. 15, 562 P.2d 745 (1977). Heath presented numerous expert witnesses who testified that Ortho-Novum 1/80 caused her HUS and resulting kidney failure. Any conflicts in the evidence were for the jury to resolve. In reviewing the sufficiency of the plaintiff's evidence, we have held that the evidence must be considered in a light most favorable to the plaintiff. It is not the province of this court to judge the weight of the evidence or credibility of the witnesses. *Wilson v. Board of County Commissioners of Adams County,* 703 P.2d 1257 (Colo.1985).

Accordingly, we hold that Heath presented sufficient evidence of the causal relationship between Ortho-Novum 1/80 and her illness to warrant a determination by the finder of fact. The defense motions to dismiss and for judgment N.O.V. were properly denied.

## III.

Ortho contends Heath's claim that Ortho-Novum 1/80 was defectively designed was not timely raised, and that the trial court did not have a sufficient factual basis to submit the claim to the jury. Alternatively, Ortho contends jury instruction no. 15, which set forth the elements of Heath's design defect claim, was erroneous. Ortho further contends that FDA approval of Ortho-Novum 1/80 precludes the giving of a design defect instruction under the Supremacy Clause, U.S. Const., art. VI, cl. 2. We discuss each contention separately.

## A.

■ As to the timeliness issue, the record contains no information concerning the procedure by which Heath's assertion that Ortho-Novum 1/80 was defectively designed was recognized by the trial court.

Ortho's brief asserts that Heath made no motion to amend her pleadings to conform to the evidence, and Heath's answer brief neither denies the assertion nor discusses the question of the timeliness of the amendment. Absent any basis in the record to suggest that the trial court abused its discretion in allowing Heath's late assertion of the claim, we cannot rule that the claim was untimely raised.

Ortho also claims the trial court did not have a sufficient factual basis to submit a design defect claim to the jury. We disagree.

■ To assess whether Heath introduced sufficient evidence to justify submission of her design defect claim to the jury requires an analysis of the elements of such claim. Courts and commentators have recognized two types of defective product claims. The first deals with a defect in the manufacturing stage; the second involves products that are produced in precisely the form intended, but which are nevertheless unreasonably unsafe. Wade, *On Product "Design Defects" and Their Actionability*, 33 Vand.L.Rev., 551 (1980). Heath's claim involves this second type of defective product. We have adopted section 402A of the *Restatement (Second) of Torts* in the context of the second type of defective product cases. *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1976); *Union Supply Co. v. Pust*, 196 Colo. 162, 583 P.2d 276 (1978). Under section 402A, Heath must establish that, while Ortho-Novum 1/80 was produced and marketed in precisely the form intended, it is unreasonably dangerous.

Because all products are dangerous when used improperly or for unintended purposes, Heath alleges that Ortho-Novum 1/80 is so designed that it is unreasonably dangerous when properly used for its intended purpose. A variety of tests have been developed to determine whether the defect (that degree of dangerousness inherent in all prescription drugs) is unreasonable. The California Supreme Court adopted the following two tests:

[I]n design defect cases, the court may properly instruct the jury that a product is defective in design if (1) the plaintiff proves that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.

*Barker v. Lull Engineering Co.*, 24 Cal.3d 413, 426–427, 143 Cal.Rptr. 225, 234, 573 P.2d 443, 452 (1978). The first test is based in part on section 402A of the *Restatement (Second) of Torts*, and it has been largely incorporated into our model jury instruction in C.J.I.-Civ.2d 14:19. The test has been characterized as the "consumer expectation test." It relies in large part upon comment i of section 402A, which defines unreasonable conduct as follows:

The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer.... The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

The second test adopts a risk-benefit analysis to measure the reasonableness of a danger. If, under this second test, a plaintiff proves causation, the manufacturer is required to establish that the product's benefits outweigh its inherent risks. The consumer expectation test or the risk-benefit test are the primary approaches used by courts faced with the question of adopting an appropriate test for design defect cases.[1]

---

1. For examples of the consumer expectation test, see *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (Alaska 1979); *Farmer v. International Har-* *vester Co.*, 97 Idaho 742, 553 P.2d 1306 (1976); *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339, 247 N.E.2d 401 (1969); *Cremeans v.*

We believe the second test as set forth in *Barker* is the appropriate standard here. The dangerousness of Ortho-Novum 1/80 is defined primarily by technical, scientific information. The consumer expectation test fails to address adequately this aspect of the problem. The risk-benefit test focuses on the practical policy issues characteristic of a product such as Ortho-Novum 1/80, which is alleged to be unreasonably dangerous despite being manufactured in precisely the form intended. Under this test, Ortho in essence argues that the benefits of the extra thirty milligrams of estrogen in Ortho-Novum 1/80 outweigh the attendant risks of the higher estrogen content. Professor Wade suggested that among the factors which may be considered are the following:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury and the probable seriousness of the injury.

(3) The availability of the substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 837–38 (1973); *See also Cepeda v. Cumberland Engineering Corp.,* 76 N.J. 152, 386 A.2d 816 (1978); *and see* Twerski, *Seizing the Middle Ground Between Rules and Standards in Design Defect Litigation,* 57 N.Y. U.L.Rev. 521 (1982) (Professor Twerski expands upon the seven factors discussed by Professor Wade, and includes among his list the role government may have played in regulating the product's design.).

Here, the record contained testimony which indicated that the increased risks of adverse reactions occasioned by the extra thirty milligrams of estrogen in Ortho-Novum 1/80 outweighed any benefits the product might produce. The record also contained evidence that Ortho-Novum 1/80 was the only available product for patients who experienced break-through bleeding and, therefore, produced benefits that outweighed any increased risks. We believe there was a sufficient factual basis for the court to have given an instruction on Heath's theory that Ortho-Novum 1/80 was unreasonably dangerous, without regard to the availability of warnings because of a design defect.[2] Where there is conflicting evidence, the question is properly submitted to the trier of fact. *Converse v. Zinke,* 635 P.2d 882 (Colo.1981).

### B.

Ortho contends in the alternative that if the court did have a sufficient factual basis to submit the defective design claim to the jury, then jury instruction no. 15, which set forth the elements of Heath's

*International Harvester Co.,* 6 Ohio St.3d 232, 452 N.E.2d 1281 (1983).

The following cases were examples of the use of risk-benefit analysis: *O'Brien v. Muskin Corp.,* 97 N.J. 169, 463 A.2d 298 (1983); *Wilson v. Piper Aircraft Corp.,* 281 Or. 61, 577 P.2d 1322 (1978); *Turner v. General Motors Corp.,* 584 S.W.2d 844 (Tex.1979); Birnbaum, *Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence,* 33 Vand.L.Rev. 593, 605 n. 54 (1980) (and cases

cited therein); *Annot.,* 96 A.L.R.3d 22 (1980) (and cases cited therein).

2. For a persuasive discussion of the policy-making function of courts in the use of multifactored criteria to determine whether to grant a motion for directed verdict on a defective design issue, see Twerski, *Seizing the Middle Ground Between Rules and Standards in Design Defect Litigation,* 57 N.Y.U.L.Rev. 521 (1982).

design defect claim, was erroneous. We agree.

Instruction no. 15 was the only instruction given to the jury on the defective design theory of the case. It states:

A product is defective when because of its manufacture or design it is not reasonably fit for the ordinary purposes for which such products are intended or may reasonably be expected to be used.

To be unreasonably dangerous, the product, because of the defect, must create a risk of harm to persons or property which would not ordinarily be expected.

This instruction simply states the "consumer expectation test," a test not suitable in prescription drug cases when the actionable product is alleged to be unsafe by design notwithstanding its production in precisely the manner intended. The failure of the trial court to give an instruction on the risk-benefit test was reversible error.[3]

## IV.

Ortho contends it was entitled to an instruction based upon comment k of section 402A of the *Restatement (Second) of Torts*. Ortho tendered such an instruction, based directly on comment k.[4] The record does not indicate the basis for the trial court's denial of the tendered instruction.[5] We believe that a comment k instruction was warranted here. In *Belle Bonfils Memorial Blood Bank v. Hanson*, 665 P.2d 118 (Colo.1983), we stated four factors to be considered in determining whether a manufacturer is entitled to a defense based on comment k:

The product's utility must greatly outweigh the risk created by its use; the risk must be a known one; the product's benefits must not be achievable in another manner; and the risk must be unavoidable under the present state of knowledge.

*Id.*, at 122.

As to the first factor under *Belle Bonfils*, expert testimony was presented that because Ortho-Novum 1/80 prevented break-through bleeding, the specific prob-

3. Ortho also claims that, because of FDA regulation, a defective design claim as to Ortho-Novum 1/80 is preempted by the supremacy clause, U.S. Const. art. VI, cl. 2. This contention was neither raised during trial nor in Ortho's motion for a new trial. We decline to address the issue. *Colgan v. State, Department of Revenue, Motor Vehicle Division*, 623 P.2d 871 (Colo.1981); *Manka v. Martin*, 200 Colo. 260, 614 P.2d 875 (1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1354, 67 L.Ed.2d 338 (1981).

4. Comment k to section 402A of the *Restatement (Second) of Torts* provides:

*Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared and accompanied by proper directions and warnings, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
(emphasis in original).

5. The plaintiff argues in part that because Ortho did not plead comment k as a defense it was not entitled to such an instruction. We note that the appropriateness of such defense no doubt became apparent only at the conclusion of all the evidence. Furthermore, because we find sufficient evidence in the record to justify the plaintiff's design defect claim, Ortho was equally entitled to amend its pleadings to conform to the evidence.

lem Heath encountered on the lower dose of Ortho-Novum 1/50, the product's benefits outweighed its risks. Regarding the second factor, several expert witnesses testified that as of 1974 medical studies indicated that higher estrogen dose oral contraceptives increased the risk of serious side effects, including the blood clotting which precipitated the plaintiff's renal failure. Moreover, medical studies prior to 1974 recommend that the use of eighty milligram estrogen pills be curtailed. As to the third factor, Ortho presented testimony that no other alternative could prevent break-through bleeding and maintain the same high degree of effectiveness against pregnancy. Finally, Ortho introduced testimonial evidence that the risk was unavoidable. We believe there was evidence in the record to support the giving of the instruction. *Converse v. Zinke,* 635 P.2d 882 (Colo.1981); *Greenwood v. Kier,* 125 Colo. 333, 243 P.2d 417 (1952); C.R.C.P. 51.1.

Evidence introduced at trial satisfied Ortho's burden of going forward as to each of the elements of the comment k defense. Because other evidence rebutted Ortho's evidence as to the comment k defense, the issue became one for the jury. *See Belle Bonfils,* 665 P.2d at 125, n. 12; *Converse v. Zinke,* 635 P.2d 882. We, therefore, conclude from a fair reading of the evidence that Ortho was entitled to an instruction based on the comment k defense.

In conclusion, because we reverse the trial court on its design defect instruction and on its failure to give a comment k instruction, we decline to address the other issues raised by Ortho.

Judgment reversed and remanded.

LOHR, J., dissents and QUINN, C.J., joins in the dissent.

DUBOFSKY, J., does not participate.

LOHR, Justice, dissenting:

The majority reverses a judgment in favor of the plaintiff, Jo Ellen Murphy Hyland Heath, and against the defendant, Ortho Pharmaceutical Corporation (Ortho), in the amount of $975,000 plus more than $500,000 prejudgment interest. Heath recovered these damages based on injuries suffered by her as a result of the use of an oral contraceptive manufactured and distributed by Ortho. The reversal is founded upon the majority's belief that the trial court did not instruct the jury properly on Heath's design defect claim and incorrectly refused Ortho's tendered instruction based on comment k of section 402A of the Restatement (Second) of Torts. I conclude that the record supports the trial court's use of the design defect instruction given to the jury and that comment k is inapplicable to the facts of this case. Therefore, I respectfully dissent.

**I.**

Heath developed a series of serious health problems beginning in 1974. Before the onset of these problems, she was a healthy, active, twenty-eight-year-old woman. Heath first suffered acute kidney failure, necessitating a kidney transplant. The treatment and medication that followed to minimize the risk of rejection of the new organ caused a pre-malignant condition known as cervical dysplasia, which is accompanied by a greatly increased risk of cervical cancer. In response to the increased cancer risk, and after two less extensive surgical procedures to attempt to remedy the condition proved unsuccessful, Heath underwent a hysterectomy. In addition to other adverse effects on Heath's health stemming from the kidney failure and later surgeries, she has experienced severe and adverse permanent changes in her physical appearance and permanent restrictions on engaging in active sports. There was evidence at trial that all these health problems had their source in Heath's use of Ortho Novum 1/80, an oral contraceptive manufactured and distributed by Ortho.

Heath brought suit against Ortho on theories including strict liability and negligence. Her strict liability claim was based upon the contentions that Ortho Novum 1/80 was defective and unreasonably dan-

gerous because of the failure of Ortho to give adequate warnings to the user that certain risks were associated with the use of the product, and also that the contraceptive was defective and unreasonably dangerous in its design. Although at trial the parties focused on the issue of whether the product was defective and unreasonably dangerous because of failure to warn of risks inherent in its use, evidence that the product was defective in design was also received.

Ortho marketed both Ortho Novum 1/80 and Ortho Novum 1/50 at the times relevant to this case. The former product had a higher estrogen content than the latter. There was evidence that the higher level of estrogen greatly increased the risk of blood clotting and that this effect in turn elevated the risk of kidney failure. The purpose for which Ortho Novum 1/80 was used instead of Ortho Novum 1/50 was to eliminate "breakthrough bleeding," a term used to describe menstrual flow during the days when the drug is being ingested. Heath experienced that condition, and her doctor recommended the higher-estrogen-level product to eliminate it. Although breakthrough bleeding is a source of discomfort and inconvenience, the record contains no indication that it has any deleterious effect on basic health.

## II.

Heath's strict liability theory is grounded in section 402A of the Restatement of Torts (Second), which provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

*See, e.g., Hiigel v. General Motors Corp.,* 190 Colo. 57, 544 P.2d 983 (1975) (adopting the doctrine of strict liability in tort as set forth in section 402A).

The principal basis on which Heath relied to establish Ortho's liability under section 402A was that Ortho Novum 1/80 was unreasonably dangerous because users were not adequately advised of the risks attendant to its use. However, Heath also claimed that the product was defective in design because the high estrogen content rendered it unreasonably dangerous to the user. That is, Heath claimed that Ortho Novum 1/80 was unreasonably dangerous when manufactured exactly as intended and properly used, irrespective of the adequacy of the warnings. *See Union Supply Co. v. Pust,* 196 Colo. 162, 583 P.2d 276 (1978) (defect in design of product, rendering it unreasonably dangerous, recognized as basis for strict liability claim under section 402A).

At the conclusion of the evidence, Heath tendered instruction no. 15 in support of the design defect claim. That instruction provided:

A product is defective when because of its manufacture or design it is not reasonably fit for the ordinary purposes for which such products are intended or may reasonably be expected to be used.

To be unreasonably dangerous, the product, because of the defect, must create a risk of harm to persons which would not ordinarily be expected.

This is precisely the form of instruction set forth for use for this purpose in CJI–Civ.2d 14:19 (1980).[1] Ortho's counsel objected to

---

1. We have made clear, however, that the Colorado Jury Instructions are not to be used if they do not reflect the prevailing law. *Federal Insurance Co. v. Public Service Co.,* 194 Colo. 107, 570

any instruction on design defect on the basis that design defect was not pleaded or argued during the trial and that there was no evidence to support it. As the majority concedes, Heath sufficiently pleaded this claim and evidence in the record supported it. Therefore, these objections were not well taken.

Ortho's counsel also argued that the second paragraph of instruction no. 15 was vague and that Ortho's tendered instruction no. 53 should have been given instead of instruction no. 15 if the court were to instruct on design defect. Proposed instruction no. 53, rejected by the court, provided:

A prescription drug is defective when the product is dangerous to an extent beyond that which would be contemplated by the ordinarily competent physician when used in an intended or reasonably foreseeable manner.[2]

The trial court gave instruction no. 15 as tendered by Heath and also included design defect in the theory of the case instruction no. 1.

In its motion for a new trial, Ortho again asserted that the evidence was insufficient to present a design defect claim to the jury, and included instruction no. 15 among the instructions said to have "incorrectly or incompletely stated the applicable law or instructed the jury on matters inapplicable to the issues between the parties." Ortho also repeated its contention that instruction no. 53 should have been given.

In its brief on appeal, Ortho once more asserts that the evidence did not support a design defect claim and contends for the first time that a risk-benefit analysis must be conducted, presumably by the jury, to determine the applicability of a design defect claim. Ortho states that "[a]ssessment of whether a product is defectively designed or not requires a balancing of its utility and danger in light of the availability or unavailability of feasible alternatives." Ortho suggests factors, including those advanced by the majority, to be used

in the balancing process. In that brief Ortho also raises for the first time the argument that the approval of the product for marketing by the Food and Drug Administration raises serious problems of preemption under the supremacy clause of the United States Constitution, article VI, cl. 2. The majority properly declines to address the supremacy clause issue on the basis that it was not raised during trial or in Ortho's motion for new trial. Majority op. fn. 3. Inexplicably, however, the majority not only addresses the appropriateness of including a risk-benefit analysis in the jury instruction on design defect—an issue also not raised at trial or in the motion for new trial—but holds that the failure of the trial court to instruct on that issue on its own initiative is reversible error. I cannot agree.

C.R.C.P. 51 provides that all instructions shall be submitted to the parties, who shall make all objections thereto before they are given to a jury. Only the grounds so specified are to be considered on a motion for new trial or on appeal. C.A.R. 1(d) provides, however, that on appeal a court in its discretion may notice any error appearing of record. We have previously considered the interrelation of these rules and have held that C.R.C.P. 51 does not preclude an appellate court from noticing error appearing on the face of the record when in the interest of justice it is appropriate to do so. *Kendall v. Hargrave*, 142 Colo. 120, 349 P.2d 993 (1960) (determined when rule appearing in C.A.R. 1(d) was contained in former C.R.C.P. 111(f)); *Warner v. Barnard*, 134 Colo. 337, 304 P.2d 898 (1956) (same). In *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579, 587 (Colo.1984), we articulated the standard to be applied in evaluating whether to consider the sufficiency of a jury instruction on appeal when no proper objection to the instruction was offered in the trial court. We held that when the instruction affects the substantial rights of the parties, an appellate court

---

P.2d 239 (1977); *see* C.R.C.P. 51.1. CJI–Civ.2d, General Directions for Use (1980).

2. This same theory was advanced in Ortho's motion for a directed verdict.

may elect to address the correctness of the instruction in order to prevent a manifest injustice to a litigant and to assure an appellate resolution of a controversy in accordance with correct principles of law. *Id.* at 587. *See Mt. Emmons Mining Co. v. Town of Crested Butte,* 690 P.2d 231, 238 (Colo.1984) (under C.A.R. 1(d), court may notice errors of record on its own initiative, especially when the errors are of a fundamental character affecting the reliability of the judgment itself).

In the present case, I believe that the majority inappropriately failed to apply the *Blueflame* standard in reversing the trial court for instructing pursuant to CJI–Civ.2d 14:19 upon the new-found basis that the jury must be required to engage in a risk-benefit analysis to determine whether a product that is alleged to be defectively designed is unreasonably dangerous under the strict liability standards of section 402A of the Restatement (Second) of Torts.

First, not only did Ortho fail to raise this issue in the trial court but it specifically tendered its own instruction no. 53, quoted above, on the basis that if a design defect instruction was to be given it should have been in the form of instruction no. 53. Although the proposed instruction speaks in terms of the contemplation of the prescribing physician rather than the user—language consistent with Ortho's theory that it owed no duty to the user—instruction no. 53 is consistent with instruction no. 15 in making the critical criterion for design defect the expectation of the party in question, i.e., the consumer or the physician. I cannot conclude that prevention of manifest injustice, *see Blueflame,* requires rejection of the consumer expectation theory underlying instruction no. 15 when both Heath and Ortho submitted instructions based upon that theory and when that theory is the basis for the instruction form set forth in CJI–Civ.2d 14:19. *See also Jack-son v. Harsco Corp.,* 673 P.2d 363, 365 (Colo.1983) ("consumer's reasonable expectations" are a focus of concern in strict liability case based on design defect theory concerning collapse of scaffolding).

Furthermore, under the facts of the present case, I do not view the consumer expectation theory of design defect to be different in kind from the risk-benefit analysis that the majority considers mandated. Whether "on balance the benefits of the challenged design outweigh the risk of danger inherent in such design," majority op. at 413 (risk-benefit test), surely relates to consumer expectation. That is, the product could hardly "perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner," majority op. at 413 (consumer expectation test), if the risks inherent in its use were shown to outweigh the benefits. No consumer would expect a manufacturer to distribute a birth control product having such qualities.

I agree that the consumer expectation and risk-benefit analyses have differences and in some cases might yield different results. It may be that submission to the jury of an extensive list of considerations to be applied in assessing whether the risk of using a product outweighed its benefits could yield a more precise evaluation of whether a product was defective in design for the purpose of strict liability analysis. This is a question I would leave for another day.[3] I do not believe on this record it would have been appropriate for the trial court to instruct on risk-benefit as the majority finds mandated, and the fact that the court did not do so certainly did not so affect the substantial rights of the parties as to make such an instruction imperative to prevent manifest injustice. *See Blueflame Gas, Inc. v. Van Hoose,* 679 P.2d at 587.

---

**3.** Even if risk-benefit analysis is accepted as appropriate in evaluating design defect claims, the burden of proof and the respective roles of judge and jury in assessing the risk-benefit balance remain as difficult questions. *See generally,* Wade, *On Product "Design Defects" and their Actionability,* 33 Vand.L.Rev. 551 (1980). This further illustrates the questionable wisdom of venturing into these uncharted waters on our own motion, especially when the justness of doing so is at best difficult to discern.

### III.

The majority also concludes that the trial court committed reversible error in refusing to give Ortho's tendered instructions nos. 66 and 67, which essentially stated the legal theory set forth in comment k to section 402A of the Restatement (Second) of Torts. I disagree. Comment k relates to certain products that are unavoidably unsafe but highly beneficial and therefore not *unreasonably* dangerous. Because of the highly beneficial nature of these products, strict liability for injury caused by their use is not to be imposed. Comment k provides:

k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk. (Emphasis in original).

Courts have been willing to apply comment k in cases involving new and experimental drugs, *e.g., Gaston v. Hunter,* 121 Ariz. 33, 588 P.2d 326, 340 (Ariz.App. 1978); *McLeod v. W.S. Merrell, Co.,* 174 So.2d 736, 739 (Fla.1965); *Cochran v. Brooke,* 243 Or. 89, 409 P.2d 904, 906 (1966), vaccines, *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1273 (5th Cir.1974), and anesthetics, *McDaniel v. McNeil Laboratories, Inc.,* 196 Neb. 190, 241 N.W.2d 822, 827 (1976). In addition, transfused blood and asbestos fiber are often deemed "unavoidably unsafe" products in accordance with comment k. *E.g., Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1088–89 (5th Cir.1973) (asbestos fiber); *Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357, 372 (E.D.Pa.1982) (same); *Belle Bonfils Memorial Blood Bank v. Hansen,* 665 P.2d 118, 127 (Colo. 1983) (transfused blood); *Moore v. Underwood Memorial Hospital,* 147 N.J.Super. 252, 371 A.2d 105, 107 (1977) (same); *Brody v. Overlook Hospital,* 127 N.J.Super. 331, 317 A.2d 392, 397 (1974), *aff'd* 66 N.J. 448, 332 A.2d 596 (1975) (same); *Daniels v. Combustion Engineering, Inc.,* 583 S.W.2d 768, 772 (Tenn.App.1978) (asbestos fiber). On the other hand, products such as a golf cart do not qualify as "unavoidably unsafe." *See Blevins v. Cushman Motors,* 551 S.W.2d 602, 608 (Mo.1977).

We recently considered the applicability of comment k in *Belle Bonfils Memorial Blood Bank v. Hansen,* 665 P.2d 118 (Colo. 1983), in connection with a claim that the comment k exception applies to transfused blood contaminated by hepatitis virus. There, we held:

The applicability of comment k to a given product depends upon the co-existence of several factors which justify the product's exception from strict liability. The

product's utility must greatly outweigh the risk created by its use; the risk must be a known one; the product's benefits must not be achievable in another manner; and the risk must be unavoidable under the present state of knowledge. 665 P.2d at 122. The majority holds that each of these factors is present in the instant case. I disagree.

First, the utility of Ortho Novum 1/80 has not been demonstrated to outweigh greatly the risk created by its use. The utility of the product is distinguished from that of Ortho Novum 1/50 in that Ortho Novum 1/80 will prevent breakthrough bleeding in circumstances where that condition attends the use of Ortho Novum 1/50. Breakthrough bleeding is not a life-threatening or even a health-threatening condition. Blood clotting, the risk of which is greatly increased with the increased estrogen dosage in Ortho Novum 1/80, threatens both health and life. The benefits of the higher estrogen dosage product are different in kind from the risks of use. The benefits relate to convenience whereas the risks involve critical health concerns.[4]

Next, I cannot agree that the benefits of the product's use are not achievable in another manner. The basic benefit of the product's use is prevention of pregnancy. It is a matter of common knowledge as well as record evidence that there are various birth control alternatives that do not require ingestion of estrogen.

Nor is the risk unavoidable under the present state of knowledge. To say that it is assumes that there is no other way to obtain the benefits of birth control and eliminate breakthrough bleeding than to increase estrogen dosage. On the contrary, the existence of other means of birth control makes the risk incident to the use of Ortho Novum 1/80 entirely avoidable.

Even if the Ortho products may be somewhat more efficient for birth control purposes than other available methods, this discrepancy in efficiency cannot be regarded to be of such consequence as to make the continued use of an estrogen product so imperative that the risk of the increased estrogen dosage is unavoidable.

I agree with the majority on one point. The jury could have found that the risk of blood clotting through the use of Ortho Novum 1/80 was known. The evidence that Ortho knew of the risk was presented through the testimony of the plaintiff's witnesses and was vigorously opposed by Ortho, for it adversely affected Ortho's defense against Heath's claim that the product was also defective because of failure to warn the user of known risks incident to its use.

In sum, Ortho Novum 1/80 is not the type of product to which comment k was intended to apply, and the trial court properly rejected Ortho's tendered instruction based on comment k. To hold otherwise would open the door to the use of a comment k defense in the absence of any "unique or profound benefit," *Belle Bonfils*, 655 P.2d at 123. This would eliminate an essential element of the rationale for comment k as a plain reading of that comment makes clear. *See id. But cf. Chambers v. G.D. Searle & Co.*, 441 F.Supp. 377, 381 (D.C.Md.1975) (holding without discussion that oral contraceptives are unavoidably unsafe products under comment k), *aff'd* 567 F.2d 269 (4th Cir.1977); *Hamilton v. Hardy*, 37 Colo.App. 375, 384, 549 P.2d 1099, 1107 (1976) (stating in dicta that Ovulen, an oral contraceptive, *"may* be 'unavoidably unsafe' as that term is used in comment k" (emphasis added)); *Ortho Pharmaceutical Corp. v. Chapman*, 180 Ind.App. 33, 388 N.E.2d 541, 545 (1979)

---

**4.** Even if a lower estrogen dosage product not having the high level of risk were not an available option, it may be questioned whether the prevention of pregnancy, without denigrating the importance of that goal to users of the product, is the kind of "unique or profound benefit," *Belle Bonfils*, 665 P.2d at 123, that comment k is intended to cover. That is, the need for prevention of pregnancy can hardly be equated with the importance of obtaining a blood transfusion notwithstanding the risk of hepatitis, or of obtaining the benefits of rabies vaccine to prevent otherwise certain death notwithstanding the possibility of certain adverse side effects.

(holding that "oral contraceptives come under the protection of comment k" because they are "potentially dangerous" but also "convenient and highly effective"); *Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831 (1981) (applying comment k to case involving oral contraceptives without discussing appropriateness of such application).

I dissent from the majority opinion. I believe that the majority should reject the grounds for reversal upon which its opinion is based and should go on to consider the other assignments of error advanced by Ortho and not addressed in the majority opinion.

I am authorized to say that QUINN, C.J., joins in this dissent.