**TOMMY'S ELBOW ROOM, INC., d/b/a Tommy's Elbow Room, Petitioner,**

v.

**Ralph KAVORKIAN, Individually and as Personal Representative of the Estate of Gladys Marie Kavorkian, Sarah Kavorkian, and Fred Brantingham, Individually and as Father and Best Friend of the Deceased, Tanya Brantingham and Martha Brantingham, Respondents.**

**No. S–1662.**

Supreme Court of Alaska.

April 22, 1988.

Joseph L. Paskvan, Hoppner & Paskvan, P.C., Fairbanks, for petitioner.

Marcus R. Clapp and Joseph S. Slusser, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for respondents.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This petition for review raises questions of first impression concerning Alaska's

---

Uniform Contribution Among Tortfeasors Act.[1]

## I. *Factual and Statutory Background*

These wrongful death and tort actions originally involved three defendants: Slicer Corporation ("Slicer"), Richard Pears, and Tommy's Elbow Room ("Tommy's"). Plaintiffs (collectively "the Kavorkians") settled with Slicer and Pears. Slicer agreed to pay the Kavorkians $538,225 in exchange for a release from any liability for the underlying accident. Pears agreed to the entry of a consent judgment in favor of the Kavorkians in the amount of $1,230,-000. This agreement did not contemplate that Pears would pay the Kavorkians this amount; rather, Pears assigned to the Kavorkians his rights against his insurer, Leader National Insurance Company ("Leader National"). In turn, the Kavorkians agreed not to execute against any of Pears' assets except the rights assigned against Leader National.[2]

Tommy's filed a motion in superior court requesting "an order establishing, as a matter of law, the amounts received by plaintiffs in settlement money and to reduce plaintiffs' claim against [Tommy's] for such amounts." Pursuant to AS 09.16.-040(1), the superior court ordered the reduction of the Kavorkians' claims against Tommy's by the amount of the Slicer settlement plus "the amount obtained from the good faith prosecution of the action against Leader National."[3] The court determined that the agreement between Pears and the Kavorkians fell within the terms of AS 09.16.040(1), but rejected Tommy's argument that the Kavorkians' claims against it should be reduced by the face amount of the agreement as contrary to both the in-tent of the parties and the intent of the statutory scheme. By way of explanation, the superior court stated:

> The purpose of the Act is to equitably distribute the burden of responsibility among joint tortfeasors, not to give a windfall to any defendant. The intent of the parties was to settle the claim against Pears for whatever plaintiffs could obtain from Leader National. The actual consideration for the agreement is thus the value of the assigned claim. That value is contingent on what happens in the suit against Leader National and cannot be assessed at the present time. So long as plaintiffs prosecute that action is [sic] good faith, the value of the assignment can best be measured by the amount, if any, obtained from Leader National. It is that amount for which Tommy's is entitled to claim reduction.

Subsequent to entry of the superior court's order, we granted Tommy's petition for review to determine whether the superior court erred in refusing to reduce the Kavorkians' claims by the total amount of the settlement agreements made with Slicer and Pears pursuant to Alaska's Uniform Contribution Among Tortfeasors Act, AS 09.16.040(1).

## II. *Construction of AS 09.16.040*

The question of whether the superior court erred in refusing to reduce the Kavorkians' claims against Tommy's by the face amount of their settlement with Pears requires interpretation of AS 09.16.040(1).[4]

The text of AS 09.16.040[5] specifies that a release or covenant not to sue or not to enforce judgment given in good faith by a plaintiff to one or more joint tortfeasors

---

1. AS 09.16.010–.060.

2. Subsequent to the assignment, the Kavorkians filed a suit in superior court against Leader National. *Kavorkian v. Leader Nat'l Ins. Co.*, No. 4FA–85–1187 (Alaska Super., May 29, 1985).

3. The Kavorkians apparently did not dispute that the Slicer settlement reduced its claim under AS 09.16.040.

4. This court has special competency to resolve issues of general statutory interpretation, *State v. Dupere*, 709 P.2d 493, 495 (Alaska 1985), mod-

*ified*, 721 P.2d 638 (1986), and applies the substitution of judgment test in reviewing them. *Norton v. Alcoholic Beverage Control Bd.*, 695 P.2d 1090, 1092 (Alaska 1985); *see also State, Commercial Fisheries Entry Comm'n v. Templeton*, 598 P.2d 77, 81 (Alaska 1979) (supreme court independently evaluates trial court decision where question of statutory interpretation raised).

5. AS 09.16.040 provides:

> When a release or covenant not to sue or not to enforce judgment is given in good faith to

reduces the claim against the others by the greater of (1) "any amount stipulated by the release or the covenant," or (2) the amount of the consideration paid for the release or covenant. In finding the amount of consideration paid by Pears—the value of the assigned contingent claim—determinative of the reduction to which Tommy's is entitled, the superior court did not address the "amount stipulated" prong of AS 09.16.040(1).

Tommy's argues that the Kavorkians' eventual recovery on the assigned claim is irrelevant because the face amount of the consent judgment represents the "amount stipulated" within the meaning of AS 09.-16.040(1) and accordingly is the amount by which the various claims of the Kavorkians should be reduced.[6] The Kavorkians respond that this interpretation would put the risk of the contingent claim against Leader National on the Kavorkians (the injured plaintiffs), contrary to the equitable design of the statute, and would in effect insulate Tommy's from liability for its wrongdoing.[7]

Tommy's argues to the contrary that the "amount stipulated by the release or the covenant" means the face amount of the consent judgment. In Tommy's view the text of AS 09.16.040 is "unambiguous." Tommy's further argues that the Kavorkians should be bound by their bargain since the agreement to the consent judgment, the covenant not to execute, and the assignment of rights comprise a freely nego-

tiated contractual arrangement between Pears and the Kavorkians. The assignment to the Kavorkians of Pears' claim against Leader National gave the Kavorkians an incentive to set the consent judgment amount high, gambling that the jury would find it reasonable and thus enforceable against Leader National. The tradeoff for this decision was the reduction of the Kavorkians' claim against Tommy's by that amount. If in hindsight the Kavorkians now are of the view that they unwisely chose to rely on the expectation of a large recovery from Leader National, that should not relieve them from the legal consequence which section .040(1) attaches to the "amount stipulated by the ... covenant" the Kavorkians entered into with Pears. We thus agree with the arguments advanced by Tommy's.

Our primary interpretative guide is the language of the statute itself, construed in light of the purpose of its enactment. *J & L Diversified Enterprises v. Municipality of Anchorage*, 736 P.2d 349, 351 (Alaska 1987); *Commercial Fisheries Entry Comm'n v. Apokedak*, 680 P.2d 486, 489–90 (Alaska 1984); *Wien Air Alaska v. Arant*, 592 P.2d 352, 356 (Alaska 1979). "If the meaning of a statute is plain it should be enforced without judicial modification or construction." *Horowitz v. Alaska Bar Ass'n*, 609 P.2d 39, 41 (Alaska 1980).

Alaska Statute 09.16.040(1) states in part that any release or covenant not to sue or not to enforce judgment "does not dis-

---

one or more persons liable in tort for the same injury or the same wrongful death

(1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater; and

(2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

6. By its argument Tommy's assumes that the Kavorkians' recovery from Leader National will not exceed $1,230,000 (the amount of the consent judgment).

7. At the outset, the Kavorkians assert that Tommy's may not avail itself of the method of apportionment of liability among multiple tort-

feasors established by the Act because, if found liable, Tommy's will necessarily be excluded from the Act's coverage as an intentional tortfeasor under section .010(c). *See* AS 09.16.-010(c) ("[t]here is no right of contribution in favor of any tortfeasor who has intentionally caused or contributed to the injury...."). Because the Kavorkians raise this argument for the first time in their appellate brief, having failed to argue it before the superior court or in their response to Tommy's petition for review, we will not address the issue. *See State, Department of Education v. Nickerson*, 711 P.2d 1165, 1170 n. 6 (Alaska 1985) (court will ordinarily decline to review claims not raised before the trial court); *Williams v. Alyeska Pipeline Serv. Co.*, 650 P.2d 343, 351 (Alaska 1982) (argument not considered on appeal because not raised below).

charge any of the other tortfeasors from liability ... unless its terms so provide." In *Fellows v. Tlingit–Haida Regional Electrical Authority,* 740 P.2d 428, 430 (Alaska 1987), we said that:

> This section abrogates the common law rule that the release of one joint tortfeasor releases all joint tortfeasors. It allows an injured plaintiff to settle with one potential tortfeasor without releasing the remaining potential joint tortfeasors from liability. The amount of any settlement, however, must be subtracted from any judgment ultimately obtained against the non-settling tortfeasors. The settlement discharges the settling tortfeasor's potential liability for contribution.

(Footnotes omitted.) The Act also retained "that part of the common law rule embody-

ing the sound public policy of permitting a plaintiff to receive only the amount of his adjudged damages and no more, regardless of the source of the recovery." *Layne v. United States,* 460 F.2d 409, 411 (9th Cir. 1972); *Perlmutter v. Blessing,* 706 P.2d 772, 775 (Colo.1985); AS 09.16.040. This policy is given effect by the provision of AS 09.16.040(1) that the claims against the remaining tortfeasors will be reduced by "any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater." [8] This provision is unambiguous and its meaning clear. The Kavorkians' claims against Tommy's must be reduced by the amount stipulated in Pears' covenant.[9]

In conclusion, we hold that the provisions of AS 09.16.040(1) are unambiguous and

---

**8.** Of additional significance is the fact that AS 09.16.040(2) provides that the release or covenant given to one tortfeasor discharges that tortfeasor "from all liability for contribution to any other tortfeasor." This effect is different than that which would have obtained under the 1939 Act. (In 1970 Alaska adopted the 1955 Uniform Contribution Among Tortfeasors Act. Ch. 80, § 1, SLA 1970.) Under section 5 of the 1939 version, the release of a tortfeasor by the injured plaintiff did not discharge his liability for contribution unless the release expressly provided for its reduction "to the extent of [his] pro rata share" of the plaintiff's recoverable damages. Unif. Contribution Among Tortfeasors Act § 4(b), Commissioners' Comment, 12 U.L.A. 99 (1975). The idea behind this provision was that the plaintiff should not be permitted to release one tortfeasor from his fair share of liability and pursue another instead, and that the release from contribution liability afforded too much opportunity for collusion between the plaintiff and released tortfeasor against the one not released. *Id.* In practice, however, the effect of this provision was to discourage settlements because the "pro rata share" cannot be determined prior to judgment against the other tortfeasors, and no defendant wants to settle when he remains open to contribution in an uncertain amount, based on judgment in another suit to which he will not be a party. *Id.*

Thus, under the 1939 Act, the settling tortfeasor was motivated to set a greater amount on the release than the consideration paid, as high an amount as possible, because that amount would reduce the plaintiff's remaining claims and consequently the judgment by which his contribution liability was determined. *See generally Martinez v. Lopez,* 300 Md. 91, 476 A.2d 197, 202 (1984). Amended in 1955 to reverse the tendency to discourage settlements by discharging the settling tortfeasor outright from all

contribution liability, 12 U.L.A., *supra,* at 100, the Act now gives the settling tortfeasor no incentive to set the release amount higher than the consideration paid. Absent an external influence such as the insurance claim here, the plaintiff similarly has no incentive to stipulate an amount greater than the consideration paid for the release, since its claim against the other tortfeasors is reduced by the greater of the two figures.

**9.** These provisions taken together indicate the legislature intended that a nonsettling tortfeasor will be liable for any part of the settling tortfeasor's pro rata share of damages greater than either the amount stipulated in the release or covenant or than the amount of the consideration paid for the release or covenant (whichever amount is higher). These same provisions further evidence "a legislative intent to provide full compensation for the plaintiff even at the expense of equitable apportionment of damages among tortfeasors." *Perlmutter,* 706 P.2d at 775.

Illustrative of these policy considerations are the following examples: A is an injured plaintiff. B and C are joint tortfeasors. A settles with B for $25,000. After trial A's damages against C are fixed at $200,000. Under the Act A obtains judgment against C in the amount of $175,000. C in turn has no right of contribution against B. Thus C ends up liable for his pro rata share of the common liability ($100,000 of $200,000) plus an additional $75,000 which represents that portion of the settling tortfeasor's pro rata share of the common liability which is greater than the amount stipulated (or received) in the settlement which was entered into between A and B.

Again, A is an injured plaintiff. B and C are joint tortfeasors. A settles with B for $175,000

require that any claims the Kavorkians have against Tommy's be reduced by $1,230,000, the "amount stipulated" to by the Kavorkians in the covenant they entered into with Pears.[10]

REVERSED and REMANDED for further proceedings consistent with this opinion.

and after trial his damages against C are fixed at $200,000. Under the Act A obtains judgment against C in the amount of $25,000. C in turn has no right of contribution against B. Here C is liable to A for less than his pro rata share of the $200,000 common liability.

10. The Kavorkians also invoke AS 09.16.030(e) in an apparent attempt to argue that any judgment obtained against Leader National does not discharge any liability of Tommy's until the Kavorkians receive satisfaction of that judgment. Section .030(e) provides:

The recovery of a judgment for any injury or wrongful death against one tortfeasor does not of itself discharge the other tortfeasors from liability for the injury or wrongful death unless the judgment is satisfied. The satisfaction of the judgment does not impair any right of contribution.

Wholly apart from the fact that this point was not decided by the superior court, it becomes clear from reading this section in context that it does not have the effect asserted by the Kavorkians. As Tommy's points out, section .030 governs enforcement of contribution rights among tortfeasors. Moreover, it has been expressly held that this section does not apply to settlements, see Wade v. Baybarz, 660 S.W.2d 493 (Tenn.App.1983), and the commentary suggests that the section was originally "thought to be

necessary out of considerations of consistency, in view of the changes made in connection with the releases in [section 4]." Unif. Contribution Among Tortfeasors Act § 3, Commissioners' Note, 9 U.L.A. 241 (1957). Section .030 was retained in the revised Contribution Act as simply a statement of "the well established rule that the injured party in obtaining judgment against one joint tortfeasor does not thereby discharge the others, although there may, of course, be but one satisfaction of the claim." 12 U.L.A., supra, at 90.

If this section were applied in this case, it would create a result totally at odds with section .040(1): instead of reducing the Kavorkians' claims against Tommy's, section .030(e) would fully discharge Tommy's upon "satisfaction" of the judgment against Pears. (That satisfaction might be deemed to be either the assignment of Pears' rights itself or the payment of any judgment by Leader National.) This discharge would happen automatically, again contrary to section .040(1), which permits such discharge only if the terms of the release so provide. Given the accepted principle of statutory construction that provisions of the same act should, where possible, be interpreted to be consistent rather than conflicting, see generally 2A N. Singer, Sutherland Statutory Construction § 46.04 (4th rev. ed. 1984), the Kavorkians' argument here is without merit.