**FIBREBOARD CORPORATION and Owens–Illinois, Inc., Petitioners,**

v.

**E. Jean FENTON, as surviving spouse of Leon W. Fenton and as personal representative of the Estate of Leon W. Fenton, Respondent.**

**No. 91SC685.**

Supreme Court of Colorado,
En Banc.

Feb. 16, 1993.

Rehearing Denied March 8, 1993.

Pryor, Carney and Johnson, Peggy S. Ball, Englewood, for petitioners.

Brobeck, Phleger & Harrison, Thomas M. Peterson, San Francisco, CA, for petitioner Fibreboard Corp.

Morgenstein & Jubelirer, Eliot S. Jubelirer, San Francisco, CA, for petitioner Owens–Illinois, Inc.

Williams & Trine, P.C., Michael A. Patrick, J. Conard Metcalf, Boulder, Blaine A. Rutenbeck, Denver, for respondent.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review the decision of the court of appeals in *Fenton v. Fibreboard Corp.*, 827 P.2d 564 (Colo.App. 1991), which was an appeal from a judgment entered on a jury verdict in a products liability action based on strict liability. The court of appeals affirmed the rulings of the district court on the issues that we accepted for certiorari review. These issues are:

1. Whether the court of appeals erred in holding that a product manufacturer may not defend strict liability failure-to-warn claims by introducing evidence showing that its product conformed to the state-of-the-art at the time of manufacture and sale.

2. Whether the court of appeals exceeded its authority and undermined legislative intent by interpreting section 13–50.5–105, 6A C.R.S. (1985 Supp.) to limit the petitioners' set-off against the judgment to collected settlement sums, instead of the "amount stipulated by the release" or the amount of consideration paid for the release, whichever is greater.

We answer the first question in the affirmative, and the second question in the negative. Accordingly, we affirm in part, reverse in part, and return this case to the court of appeals with directions to remand to the trial court for a new trial consistent with this opinion.[1]

## I

E. Jean Fenton, respondent, filed an action for wrongful death and loss of consortium arising from the illness and death of her husband, Leon Fenton, from malignant mesothelioma.[2] The complaint, which was brought against numerous manufacturers of insulation products that contained asbestos, sought compensatory and punitive damages and was based on strict liability for failure-to-warn.[3] The respondent asserted that her husband's exposure to asbestos dust in 1957 and 1958, while working as a plumber during the construction of the United States Air Force Academy, caused the mesothelioma. The manufacturers' products were alleged to be defective and unreasonably dangerous based on a failure to provide warnings about the dangers of asbestos. Prior to trial, the respondent entered into settlement agreements with a number of manufacturers, including the Johns Manville Personal Injury Settlement Trust (Manville Trust). With the exception of the Manville Trust, the settling manufacturers paid the settlement amounts in full prior to trial.[4]

At trial, Fibreboard and Owens–Illinois, the petitioners, sought to introduce evidence to establish that their products conformed to the level of scientific and technical knowledge considered to be state-of-the-art in 1957 and 1958 when the products were sold for use. The trial court held that admission of state-of-the-art evidence was

1. We also granted certiorari on a discovery abuse issue. The issue is moot because of our order for a new trial and will not be addressed. *See Humphrey v. Southwestern Dev. Co.*, 734 P.2d 637, 639 (Colo.1987) (holding that when issues presented become moot due to subsequent events, the supreme court will decline to render a written opinion on the merits).

2. Mesothelioma is a rare form of cancer that grows on the outside lining of the lung and can be caused by occupational exposure to asbestos or for reasons that are not yet known.

3. The respondent's complaint listed eighteen different companies that supplied asbestos-related products used in the construction of the United States Air Force Academy. All of the named defendants except the petitioners either settled the claims or were dismissed from the action prior to trial.

4. To date, the Manville Trust has not paid the settlement amount of $85,000 to the respondent. The record reflects that it is speculative as to what, if any, amounts will be paid in the future. *See infra* note 18.

inconsistent with the respondent's strict liability theory because the focus in strict liability is on the product itself and not the conduct of the manufacturer.[5] Therefore, the admission of state-of-the-art evidence to determine whether the asbestos products were defective and unreasonably dangerous was precluded. However, the introduction of state-of-the-art evidence was permitted for the limited purpose of ascertaining whether the respondent could recover exemplary damages.[6]

At the conclusion of the trial, the trial court directed a verdict against the petitioners on the issue of liability for failure to warn Leon Fenton of the dangers of asbestos.[7] However, the trial court allowed the jury to determine issues relating to product identification, medical causation, and the amount and type of damages incurred. The jury returned a verdict for the respondent in the amount of $190,000 and the trial court entered a judgment for that amount plus interest and costs. The petitioners subsequently moved to alter or amend the judgment to reflect a set-off of the amount of settlements with the other defendants. The trial court ordered a partial set-off in the amount of the settlements that had been collected by the respondent, but disallowed a set-off for the $85,000 still owed the respondent by the Manville Trust.[8]

The petitioners appealed to the court of appeals claiming that the trial court erred in directing a verdict against them on the issue of liability. The petitioners further contended that the trial court erred by failing to allow a set-off for the amount that was uncollected from the Manville Trust.

5. The trial court quoted *Anderson v. Heron Engineering Co.,* 198 Colo. 391, 604 P.2d 674 (1979):

> [T]he defendant attempts to complicate a rather simple test for strict liability of whether the failure to adequately warn of the potentially dangerous propensities of its product rendered that product unreasonably dangerous. It is of no import whether this warning comported with the warning a reasonably prudent manufacturer would have given.
>
> A favorable reception for the argument that strict liability depends upon a manufacturer's knowledge or reasonable imputation of knowledge would focus attention away from the condition of the product (strict liability) and back to the reasonableness of the manufacturer's conduct. Such a result would be incongruous and incorrect, for in a strict liability case, the focus is on the product, not on the conduct or knowledge of the defendant.

198 Colo. at 398, 604 P.2d at 678–79 (citations omitted).

6. The record contains conflicting evidence as to whether exposure to asbestos by workers who applied finished products containing asbestos in 1958 were at risk of contracting mesothelioma from their occupational exposure if the occupational exposure was below the threshold limit adopted by the American Conference of Governmental Industrial Hygienists. The trial court allowed the introduction of this evidence to rebut the respondent's claim for exemplary damages and the jury did not award exemplary damages.

7. The trial court said:

> [T]he defendant claims that it was relieved from having to warn because it didn't know that [the product] was dangerous and defective, and that's not the law in Colorado. [Section 402A of the Restatement (Second) of Torts] remains a viable theory in Colorado to the present day, according to all of the cases this Court has read.
>
> I have specifically relied on *Anderson v. Heron* and *Camacho v. Honda* for the general idea that [402A] remains a theory of law for recovery in products liability litigation. Because of that, I am going to find as a matter of law, that because ... there is no evidence that the products were safe [and] ... there is no evidence they weren't defective or unreasonably dangerous, there is no evidence that either of these defendants warned against them, that I am going to direct a verdict of liability on the issue of defect.

8. The court provided that:

> [I]f any of the settlement with the [Manville Trust] is ever received by the Plaintiff, the law requires that the joint tortfeasors against whom she has obtained a judgment ... receive the benefit of the proceeds received from that settlement ... and that Plaintiff should not have a double recovery.
>
> ....
>
> IT IS HEREBY ORDERED that any and all funds received by the Plaintiff in the future from the [Manville Trust] shall be forthwith paid over by her to the Clerk of the District Court, Boulder County, Colorado.... Plaintiff shall notify the Court [and all parties] of the receipt and deposit of such funds with the Clerk. Thereafter, any party may apply to the Court for an Order regarding distribution of such funds, in accordance with this Order.

The court of appeals, relying on *Anderson v. Heron Engineering Co.*, 198 Colo. 391, 604 P.2d 674 (1979), affirmed the trial court's determination that state-of-the-art evidence was not admissible in strict liability failure-to-warn claims in Colorado. The trial court's resolution of the set-off issue was also affirmed by the court of appeals on the ground that the legislative intent behind Colorado's set-off statute, § 13–50.5–105, 6A C.R.S. (1985 Supp.), was to retain the rule of joint and several liability in actions involving joint tortfeasors and to provide full compensation for a plaintiff even at the expense of equitable apportionment of damages among the tortfeasors.

We hold that state-of-the-art evidence is properly admissible in strict liability failure-to-warn claims to determine whether the product is defective and unreasonably dangerous because of a failure-to-warn, and that it was error for the trial court to direct a verdict against the petitioners on the issue of liability in this case. We also hold that section 13–50.5–105 requires that settlement amounts be actually collected before they may be set-off against the total judgment that is owed by the remaining joint and severally liable tortfeasors.

## II

We have not addressed the issue of whether state-of-the-art evidence is admissible for purposes of strict liability failure-to-warn claims outside of the context of drugs and medical products. In *Belle Bonfils Memorial Blood Bank v. Hansen*, 665 P.2d 118 (Colo.1983), we held that state-of-the-art evidence is relevant and admissible

when offered in support of what is commonly referred to as a "comment k defense." *Id.* at 122.[9]

The respondent claims that state-of-the-art evidence should not be admitted in cases that do not fall within comment k. Such evidence, according to the respondent, could prevent manufacturers from being held strictly liable for failing to warn a user or consumer of dangers inherent in the use of a product by mixing reasonableness and foreseeability concepts of negligence law with precepts of strict liability in violation of our prior decisions. Both the trial court and the court of appeals agreed with the respondent and rejected the evidence in this case.

 The petitioners contend that the rejection of state-of-the-art evidence transforms a manufacturer's liability in failure-to-warn cases into absolute liability, thereby rendering the manufacturer the virtual insurer of the product's safe use. We agree with the petitioners that state-of-the-art evidence is properly admissible to establish that a product is not defective and unreasonably dangerous because of a failure-to-warn. A manufacturer cannot warn of dangers that were not known to it or knowable in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture and distribution. Here, the evidence of whether the dangers of contracting mesothelioma was scientifically or medically known or knowable in 1957 and 1958 was in conflict, and it was error to direct a verdict against the petitioners on the issue of liability in this case.

 In *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975), we

---

**9.** Comment k to section 402A of the Restatement (Second) of Torts discusses liability of manufacturers and distributors of certain products, such as drugs, which can never be made completely safe, but whose utility outweighs the dangers created by the product. *See* Restatement (Second) of Torts, § 402A cmt. k (1965). Comment k states in pertinent part:

There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and

ordinary use. These are especially common in the field of drugs.... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently desirable product, attended with a known but apparently reasonable risk.

adopted the doctrine of strict liability in tort for selling a product in a "defective condition unreasonably dangerous to the user or consumer" as stated in section 402A of the Restatement (Second) of Torts.[10] Although *Hiigel* was a failure-to-warn case, injured parties may also invoke strict liability for manufacturing .defects and design defects. *See* Restatement (Second) of Torts, § 402A (1965).

█ In defining defective and unreasonably dangerous, we have recognized that certain aspects of negligence are present in both design-defect and failure-to-warn cases. In *Hiigel*, we defined defect in the context of a failure-to-warn claim and stated that the duty of the manufacturer is "to appropriately label the product giving due consideration to the likelihood of accident and the seriousness of consequences from failure-to-warn." *Hiigel*, 190 Colo. at 63, 544 P.2d at 988.[11] The *Hiigel* standard, which weighs the likelihood of an accident with the seriousness of the harm, is similar to the risk-benefit test that we adopted for design-defect cases in *Ortho Pharmaceutical Corp. v. Heath*, 722 P.2d 410 (Colo. 1986), *overruled on other grounds by Armentrout v. FMC Corp.*, 842 P.2d 175 (Colo.1992). The risk-benefit test enumerated in *Ortho* includes various factors that are useful in defining defective and unreasonably dangerous and includes language which is rooted in negligence. *Ortho*, 722 P.2d at 414.[12] Therefore, both failure-to-warn and design-defect cases employ "negligence terms" to assist a trier of fact in determining whether a product is defective and unreasonably dangerous.[13]

█ We revisited and revised the risk-benefit test for design defects in *Armentrout v. FMC Corp.*, 842 P.2d 175 (Colo. 1992). The plaintiff in *Armentrout* was injured when he was crushed at the pinch point on a mobile crane on which he was working. In addressing the plaintiff's claim that he did not bear the burden of proving certain elements of the risk-benefit test, we refined the *Ortho* analysis by stat-

**10.** The phrase "defective condition unreasonably dangerous to the user or consumer" connotes that the product must be both defective and unreasonably dangerous. However, in the context of failure-to-warn claims, the concepts of defect and unreasonable dangerousness have merged. In failure-to-warn cases it is the lack or insufficiency of a warning that makes a product both defective and unreasonably dangerous. *See Hiigel*, 190 Colo. at 63, 544 P.2d at 983 (holding that where there is a failure to comply with a duty to warn, the effect is that the product may be considered defective); *Union Supply Co. v. Pust*, 196 Colo. 162, 173, 583 P.2d 276, 283 (1978) (holding that a failure to adequately warn can render a product defective and the "defective condition" is unreasonably dangerous if the manufacturer fails to give sufficient warnings to make the product safe); *see also* John W. Wade, *On the Effect in Product Liability of Knowledge Unavailable Prior to Marketing*, 58 N.Y.U.L.Rev. 734, 741 (1983) (commenting that although the language of section 402A suggests that defectiveness and unreasonable danger are two separate requirements, comments g, h, and i equate the two terms by describing defect in terms of unreasonable danger).

**11.** This view is in accord with the prevailing view that a defendant generally will not be liable for a failure to warn unless it is shown that the defendant either knew, or should have known in the exercise of ordinary care, of the risk or hazard that he failed to warn against. *See* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts*, § 99, at 697 (5th ed. 1984).

**12.** We adopted the risk-benefit test as set out in the California case of *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978). The test includes the weighing of several factors that could be considered in determining whether a particular product's risks outweigh the benefits. *See* John W. Wade, *On the Nature of Strict Liability for Products*, 44 Miss.L.J. 825, 837–38 (1973) (listing seven factors a trier of fact could consider in determining defect and unreasonable dangerousness).

**13.** *See also* James A. Henderson, Jr. & Aaron D. Twerski, *A Proposed Revision of Section 402A of the Restatement (Second) of Torts*, 77 Cornell L.Rev. 1512, 1516–17 (1992) (stating that "in contrast to manufacturing defects, design and warning defects require more flexible definitions [because] one cannot determine mechanically whether the design or marketing of a product is defective; some sort of risk-utility balancing is necessary").

ing that the risk-benefit test requires flexibility to decide which of the risk-benefit factors apply to the facts of the case. *Id.* at 184. We further stated that the list of factors may be expanded or contracted as needed. *Id.* We also listed several additional factors which were not included in *Ortho* but may still be used in applying the risk-benefit test. One of these additional factors which we identified was labeled "State of the art." State-of-the-art would be an applicable factor in a design-defect case if the alternative design suggested by the plaintiff was not practically feasible in light of the state of the art at the time the product was manufactured. *See id.* 184 n. 10; *see also,* Aaron D. Twerski, *Seizing the Middle Ground Between Rules and Standards in Design Defect Litigation,* 57 N.Y.U.L.Rev. 521, 527 (1982) (listing factors which may be applied in risk-benefit analysis). State-of-the-art evidence is clearly admissible and is a factor to consider in determining whether a product is defective and unreasonably dangerous due to a defective design. *See Roberts v. May,* 41 Colo.App. 82, 583 P.2d 305 (1978) (holding that state-of-the-art evidence is admissible in defective design cases).

Failure-to-warn claims are not sharply differentiated from design-defect claims and often arise in the same context. *Armentrout,* 842 P.2d at 181.[14] We perceive no reason why state-of-the-art evidence should be admissible in strict liability design-defect claims and not be admissible in strict liability failure-to-warn claims. We do not believe a court should shy away from using appropriate "negligence terms" that are necessary to properly define defect and unreasonably dangerous in the context of either design-defect or failure-to-warn claims. *See, e.g., Camacho v. Honda Mo-*

*tor Co.,* 741 P.2d 1240, 1245–46 (Colo.1987) (stating that, in addressing nonmanufacturing-defect claims, the difficulty of referring to certain negligence concepts in an area designed to be free from those concepts is much less troublesome than are the problems inherent in attempting to avoid dealing with the competing interests involved in allocating the risk of loss in products liability actions).

Our holding today is not inconsistent with *Anderson,* on which both the court of appeals and the trial court relied. In *Anderson,* the defendant claimed that because "*it* had no knowledge of any prior [problems with its product] it should not have borne any responsibility for the plaintiff's injury." *Anderson,* 198 Colo. at 398, 604 P.2d at 678 (emphasis added). In rejecting the defendant's argument, we held that the "contention that liability should be imposed only if [the defendant] knew or should have known of a hidden defect or danger mixes 'reasonableness' and 'foreseeability' concepts of negligence law with precepts of strict liability." *Id.* There was no allegation in *Anderson* that the state-of-the-art at the time of manufacture prevented the defendant from providing a warning of the dangers inherent in the use of its product. In the present case, by contrast, the petitioners are claiming that the particular risk, contracting mesothelioma from exposure to asbestos, was not known or knowable in light of generally recognized and prevailing scientific and medical knowledge available in 1957 and 1958, and therefore, their products did not require a warning.

■ The factual distinction between *Anderson* and the present case highlights the difference between a negligent failure-to-warn claim and a strict liability failure-

**14.** The risk-benefit test and the definition of defect in failure-to-warn cases clearly recognize the important distinction between manufacturing defects on the one hand, and design and failure-to-warn defects on the other. *See Camacho v. Honda Motor Co.,* 741 P.2d 1240, 1247 (Colo.1987) (stating that the question in manufacturing defect cases is whether the product as produced conformed with the manufacturer's specifications and that resolution of whether a particular product is unreasonably dangerous for purposes of design-defect or failure-to-warn cases is much more difficult because the product has been manufactured exactly as intended but is defective for another reason).

to-warn claim. Under a negligence theory a plaintiff is required to prove that a manufacturer's failure to warn of a risk fell below an acceptable standard of care. Under a strict liability theory, however, the focus of the inquiry is whether the defendant failed to warn of particular risks that were known or knowable in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture and distribution. *See Anderson v. Owens–Corning Fiberglas Corp.*, 53 Cal.3d 987, 281 Cal.Rptr. 528, 810 P.2d 549 (1991).[15]

■ Strict liability is not absolute liability and a manufacturer is not required to be the virtual insurer of its products. Instead, the scope of liability under section 402A is limited. *See Kysor Indus. Corp. v. Frazier*, 642 P.2d 908, 911 (Colo.1982).[16] To establish liability under section 402A, a plaintiff is required to establish that a product is defective and unreasonably dangerous. *Camacho*, 741 P.2d at 1245. In failure-to-warn cases, a product is not defective and unreasonably dangerous if a particular risk is not known or knowable in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture and

distribution. Therefore, state-of-the-art evidence introduced by a manufacturer in an attempt to establish that its product was not defective and unreasonably dangerous because of a failure to warn is both relevant and admissible.

### III

■ The petitioners contend that the court of appeals erred in limiting their statutory right to set-off pursuant to § 13–50.5–105, 6A C.R.S. (1985 Supp.).[17] Both the trial court and the court of appeals limited the amount of the petitioners' set-off to the amounts actually collected from the settling defendants rather than the amounts provided for in the settlement agreements. We agree with the court of appeals.

Prior to its amendment in 1986, section 13–50.5–105 provided:

(1) When a release or a covenant not to sue or not enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against

15. *Anderson v. Owens–Corning* provides the following example of this distinction:
 [A] reasonably prudent manufacturer might reasonably decide that the risk of harm was such as not to require a warning as, for example, if the manufacturer's own testing showed a result contrary to that of others in the scientific community. Such a manufacturer might escape liability under negligence principles. In contrast, under strict liability principles the manufacturer has no such leeway; the manufacturer is liable if it failed to give warnings of dangers that were known to the scientific community at the time it manufactured or distributed the product.
 *Anderson v. Owens–Corning*, 281 Cal.Rptr. at 538, 810 P.2d at 559.

16. We agree with *Anderson v. Owens–Corning*, which made the following comments regarding the failure to give warnings:
 If every product that has no warning were defective per se and for that reason subject to

strict liability, the mere fact of injury by an unlabelled product would automatically permit recovery. That is not, and has never been, the purpose and goal of the failure-to-warn theory of strict liability. Further, if a warning automatically precluded liability in every case, a manufacturer or distributor could easily escape liability with overly broad, and thus practically useless, warnings.
*Anderson v. Owens–Corning*, 281 Cal.Rptr. at 537, 810 P.2d at 558 (citations omitted).

17. Section 13–50.5–105 was amended in 1986. The amended statute applies to all actions commenced on or after July 1, 1986. *See* An Act Concerning Joint and Several Liability in Civil Actions, ch. 108, sec. 7, 1986 Colo.Sess.Laws 680, 682. Because this action was commenced on January 25, 1985, the pre–1986 statute applies, and we do not comment on the applicability of the amended statute to claims based on strict liability.

the others to the extent of any amount stipulated by the release or the covenant, or the amount of the consideration paid for it, whichever is greater; and

(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

The petitioners claim the phrase "but it reduces the claim against the others to the extent of any amount stipulated in the release or the covenant, or the amount of consideration paid for it, whichever is the greater" in subsection (1)(a) *mandates* a set-off for the full amount provided for in the Manville Trust settlement even though the respondent has received none of the agreed settlement monies.

In *Perlmutter v. Blessing*, 706 P.2d 772 (Colo.1985), we addressed the phrase "claim against the others" in subsection (1)(a) and held that it was ambiguous. In dicta, we also stated that "[w]here the only injuries involved in an action are those for which all tortfeasors are jointly or severally liable, the application of the section is clear: either the settlement amount or the amount provided for in the settlement document, whichever is greater, must be deducted from the total judgment against the remaining tortfeasors." *Id.* at 775. The

statement was of little significance in *Perlmutter* because the facts involved a settlement agreement that had been paid in full at the time of trial. In this case, however, the Manville Trust has paid no amount towards the settlement and it is of considerable doubt if, or when, any payment will be received.[18]

Section 13–50.5–105 was enacted by the General Assembly in 1977 as part of the "Uniform Contribution Among Tortfeasors Act." *See* §§ 13–50.5–101 to –106, 6A C.R.S. (1985 Supp.). By enacting section 13–50.5–105, the General Assembly abrogated the common-law tort rule which held that the release of one tortfeasor operated to release all tortfeasors from liability for the same tort. *Cingoranelli v. St. Paul Fire & Marine Ins. Co.*, 658 P.2d 863, 866 (Colo.1983). While the primary purpose of section 13–50.5–105 was to encourage settlements and permit the equitable apportionment of damages among tortfeasors who are jointly responsible for a plaintiff's injuries, the General Assembly retained joint and several liability for all tortfeasors found to be liable for the same injury. *Perlmutter*, 706 P.2d at 775; *Kussman v. City & County of Denver*, 706 P.2d 776, 778 (Colo.1985).[19]

 Joint and several liability ensures that even if one or more of the joint

---

18. The trial court stated:

Before trial, Plaintiff settled her claims against Johns–Manville, a manufacturer of asbestos products that went bankrupt in 1982, with the Manville Personal Injury Settlement Trust, a trust organized pursuant to the bankruptcy court order. The amount of settlement promised to be paid, *subject to bankruptcy court order, at some indefinite time in the future*, was $85,000.00. At the time of settlement and trial, and now to this date some 21 months later, no amount of the settlement with the Fund has been paid. The settlement *is not evidenced by a note, does not bear interest, and is not payable on any now known or ascertainable date*. Whether there will be any payment at all of the settlement amount, and if so, the final amount of any payment, when any payment is or may be made, whether the payment, if any, will be made in a lump sum or in periodic installments, and numerous other aspects of this agreement necessary to estimate the value of the settlement are all totally dependent upon the proceedings in the Manville Corporation

bankruptcy—proceedings over which neither the court, the plaintiff, nor the other parties have any control or right of control. A Federal court injunction prohibits the Fund from paying any such settlements, including the instant settlement, and prohibits parties, such as those before the court in this case, from filing suit to collect settlements or even claims reduced to judgment. *Therefore, whether plaintiff will actually receive any of her settlement with the Trust, and if so, when, is totally speculative.* (Emphasis added.)

19. Our holding in this case furthers the General Assembly's goal of encouraging settlements. Once a joint tortfeasor enters into and satisfies a settlement agreement, *his liability for amounts owed by his co-tortfeasors, or to his co-tortfeasors, is extinguished* and he no longer bears the risk that another tortfeasor is judgment proof or insolvent. *See* § 13–50.5–105(1)(b) (a release or covenant not to sue discharges the tortfeasor from all liability for contribution to any other tortfeasor).

tortfeasors is insolvent or judgment proof, an injured party may still recover the full amount of the judgment from each of the remaining tortfeasors. *Kussman*, 706 P.2d at 780; *National Farmers Union Property & Casualty Co. v. Frackelton*, 662 P.2d 1056, 1059 (Colo.1983).[20] Thus, even though section 13–50.5–105 permits the set-off of settlements received by a plaintiff from other joint tortfeasors, it is the non-settling tortfeasors who bear the risk of the insolvency of parties who are jointly and severally liable, and not the innocent plaintiff. *Id.*[21]

The trial court's order regarding set-off of the Manville Trust settlement properly allocates the risk that no amounts under the settlement agreement will be paid to the guilty tortfeasors rather than the innocent injured party. If, however, the Manville Trust pays some or all of the settlement amount, the monies are to be deposited into an interest bearing account and the petitioners may seek an order from the trial court for distribution pursuant to the trial court's order. The order furthers the intent of the General Assembly that settlements be encouraged and plaintiffs be fully compensated for injuries caused by the actions of joint tortfeasors.

## IV

We hold that state-of-the-art evidence is properly admissible in strict liability failure-to-warn claims to determine whether the product is defective and unreasonably

dangerous, and that it was error for the trial court to direct a verdict against the petitioners on the issue of liability in this case. We also hold that section 13–50.5–105, prior to its amendment in 1986, required that settlement amounts be actually collected before they may be set off against the total judgment owed by the remaining joint tortfeasors. Accordingly, we affirm in part, reverse in part, and return this case to the court of appeals with directions to remand it to the district court for a new trial consistent with this opinion.

ROVIRA, C.J., concurs in part and dissents in part.

LOHR, J., specially concurs.

Chief Justice ROVIRA concurring in part and dissenting in part:

I agree with Part II of the majority opinion holding that state-of-the-art evidence introduced by a manufacturer is both relevant and admissible as a defense to a strict liability failure-to-warn claim. I disagree, however, with the majority's conclusion in Part III and therefore, respectfully dissent to that part.

## I

Section 13–50.5–105, 6A C.R.S. (1985 Supp.), prior to the 1986 amendments to that section,[1] provided:

(1) When a release or a covenant not to sue or not enforce judgment is given in

---

**20.** In discussing joint and several liability, we have said that "all those who actively participate in any manner in commission of a tort are jointly and severally liable therefor, and [because the tort is] integral and indivisible, either or any or all of the joint tort-feasors may be held liable for the whole of the damages resulting from their tortious act." *Miller v. Singer*, 131 Colo. 112, 116, 279 P.2d 846, 848 (1955).

**21.** Our holding, that the settlement amount must actually be paid, also comports with traditional equitable concepts of set-off. Under traditional equity theory, ordinarily a possible but unestablished liability, unliquidated in amount, may not be set-off against a liquidated claim that is due and payable. *See, e.g., Ex parte*

*Stember*, 262 Ala. 56, 77 So.2d 351 (1955); *Termini v. John Arthur Exhibitions, Inc.*, 9 Misc.2d 557, 833, 169 N.Y.S.2d 584 (N.Y.Sup.Ct.1957).

**1.** Section 13–50.5–105, 6A C.R.S. (1987), now provides:

(1) When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
(a) It does not discharge any of the other tortfeasors from liability for their several pro rata shares of liability for the injury, death, damage, or loss unless its terms so provide; but it reduces the aggregate claim against the others to the extent of any degree or percent-

good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or the amount of the consideration paid for it, whichever is greater;

(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

The majority concludes that, in spite of the plain language of this section, "settlement amounts must be actually collected before they may be set off against the total judgment owed by the remaining tortfeasors." Maj. op. at 1177.

In reaching this conclusion, the majority correctly observes that in *Perlmutter v. Blessing*, 706 P.2d 772 (Colo.1985), we stated, in dicta, that "[t]he application of [section (1)(a) ] ... is clear: either the settlement amount or the amount provided for in the settlement document, whichever is greater, must be deducted from the total judgment against the remaining tortfeasors." *Id.* at 775. The majority is also correct in observing that this statement had little practical significance in *Perlmutter.* Whether this statement was dictum, and whether it was of practical significance in *Perlmutter,* one thing is perfectly clear: This statement is nothing more than a rephrasing of the plain language of section 13–50.5–105(1)(a).

We have repeatedly stated that the primary task of a court in construing a statute is to ascertain and give effect to the intent of the legislature. *See People v. Schuett,* 833 P.2d 44 (Colo.1992); *Goebel v. Colorado Dept. of Inst.,* 830 P.2d 1036 (Colo.1992). We have also repeatedly stated that in giving effect to legislative intent, our starting point is the language of the statute itself. *See Colorado State Bd. of Medical Examiners v. Saddoris,* 825 P.2d 39 (Colo.1992); *R.E.N. v. City of Colo. Springs,* 823 P.2d 1359 (Colo.1992). In addition, we have said that the language of a statute is to be given effect according to its commonly accepted and understood meaning. *Jones v. Cox,* 828 P.2d 218 (Colo. 1992).

The term "stipulation" is defined as "a material condition, requirement, or article *in an agreement." Black's Law Dictionary* 1415 (6th ed. 1990) (emphasis added). An "agreement" is further defined, in part, as "the union of two or more minds in a thing done *or to be done." Id.* at 67 (emphasis added). According to its commonly accepted meaning therefore, the language "[a]ny amount stipulated by the release or covenant, or the amount of consideration paid" cannot be understood to contain the requirement that such "stipulated" amounts actually be collected by the injured party. *See In Re Joint E. Southern Dists. Asbestos Lit.,* 798 F.Supp. 940, 954 (E.D.N.Y. & S.D.N.Y.1992) (construing statute similar to § 13–50.5–105, 6A C.R.S. (1985 Supp.), and allowing set-off in the amount of $590,000 stipulated to by Fibreboard while recognizing that, contingent upon Fibreboard's action against its insurer, settling plaintiff may not recover anything from Fibreboard); *Tommy's Elbow Room, Inc. v. Kavorkian,* 754 P.2d 243 (Alaska 1988) (construing identical statutory provision and finding no requirement of actual payment of monies prior to set-off).

Though the plain language of the statute itself provides sufficient grounds for my disagreement with the majority's "actual collection" rule, there are additional considerations that warrant a contrary result. Because recovery from the Manville Trust turns on a number of contingencies which

age of fault or negligence attributable by the finder of fact, pursuant to section 13–21–111(2) or (3) or section 13–21–111.5, to the tortfeasor to whom the release or covenant is given; and

(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

may or may not result in actual collection, the majority holds that the amount of that settlement cannot be set off. I, however, am unable to find a principled basis by which to distinguish those contingencies from any number of other contingencies which may arise in the context of a settlement agreement. For example, if actual collection is required prior to set-off, then in all structured settlement agreements remaining tortfeasors will not be entitled to have judgments against them reduced by the aggregate amount of such settlements. Like the settlement with the Manville Trust, there can be no absolute guarantee that, whether insured or not, every installment of a structured settlement will actually be paid. This will be the case for each and every installment of the structured settlement, until each is actually tendered. Therefore, an actual collection rule is likely to create serious administrative difficulties that can only result in confusion and unnecessary litigation.

Moreover, as one court has correctly observed, "[a] rule ... that treated contingent settlements as zero would not only be unfair to the defendant but also might encourage all plaintiffs to make all settlements contingent upon some future event so as to reduce the total set-offs to nothing and collect full joint and several recovery from non-settlors." *In Re Joint E. & Southern*, 798 F.Supp. at 954. Creating an actual collection requirement, therefore, would not only invite confusion and litigation, but actually could hinder the statute's effective and intended operation of allowing set-offs for stipulated amounts against the total judgment owed by remaining tortfeasors.

## II

I find it unnecessary to recast the meaning of section 13–50.5–105(1)(a) to require that settlement monies actually be paid prior to their set-off against the total judgment owed by other tortfeasors. Had the General Assembly intended this additional requirement to be met prior to set-off, it simply could have included a provision so requiring in the statute. Because the legislature did not so provide, and because implying such a requirement would create serious problems that will likely defeat the very purpose of the statute, I would reverse that part of the court of appeals decision holding that Fenton must actually receive the amount stipulated to with the Manville Trust before that amount could be set off against the total judgment owed by the other tortfeasors.

For the foregoing reasons, I respectfully dissent from Part III of the majority opinion.

Justice LOHR specially concurring:

I concur in the judgment of the court and in parts I and II of the majority opinion. I would confine the holding in part III to the facts of this case, in particular, the facts concerning the dubious and contingent ability of the respondent to collect any part of the $85,000 settlement with the Manville Personal Injury Settlement Trust, as recognized at the time the respondent entered into the settlement agreement with that trust. *See* maj. op. at 1176 n. 18. For the reasons set forth in Chief Justice Rovira's dissenting opinion, I do not agree that as a general proposition, "section 13–50.5–105, prior to its amendment in 1986, required that settlement amounts be actually collected before they may be set off against the total judgment owed by the remaining joint tortfeasors." *See* maj. op. at 1177.